UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
CAROL A. SMITH,                                       :
                                                      :
                              Plaintiff,              :
                                                      :      **COMPLAINT**
              -against-                               :      Jury Trial Demanded
                                                      :
THE EPISCOPAL DIOCESE OF LONG ISLAND,                 :
CHRIST EPISCOPAL CHURCH SAG HARBOR,                   :
REVEREND KAREN ANN CAMPBELL and                       :
CLAUDIA WARD                                          :
                              Defendants.             :
--------------------------------------------------------------x

Plaintiff, by her attorney LAW OFFICE OF BRIAN L. GREBEN, complaining of the

defendants, alleges as follows:

## PRELIMINARY STATEMENT

1.      This case is brought under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C.

§ 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq.; and New York State

Human Law, N.Y. Executive Law §290 et seq.

## JURISDICTION

2.      The jurisdiction of the Court over this controversy is based upon 42 U.S.C. §2000e

et. seq., and 28 U.S.C. §§ 1331 and 1367(a).

## VENUE

3.      The unlawful practices alleged below were committed within the State of New

York. At the time of the unlawful practices, plaintiff was a resident of Suffolk County in the

Eastern District of the United States District Court of New York.

4.      Defendant The Episcopal Diocese of Long Island ("Diocese") is and has been a

voluntary association of churches (including Defendant Christ Episcopal Church Sag Harbor)

which abide by the Canons and Constitution of the Episcopal Church, has continuously been doing

business in the State of New York, in the City of New York in the County of Queens, and in the Counties of Kings, Nassau and Suffolk, has continuously had at least 15 employees, and is located at 36 Cathedral Avenue, Garden City, New York 11530 in the Eastern District of the United States District Court of New York.

5.      Defendant Christ Episcopal Church Sag Harbor (hereinafter referred to as "Sag Harbor" and/or "Church") is located at 5 Hampton St, Sag Harbor, NY 11963 in the Eastern District of the United States District Court of New York.

6.      Sag Harbor is, upon information and belief, a Domestic not-for-profit corporation incorporated pursuant to the New York State Religious Corporations Law.

7.      Defendants Reverend Karen Ann Campbell and Claudia Ward (hereinafter referred to as "Campbell" and "Ward" (collectively, "individual defendant") are employed by the Diocese and Sag Harbor in the Eastern District of the United States District Court of New York. This Court is thereby proper venue under 28 U.S.C. §§1331 and 1391(b).

## **FACTS**

### **A.  Plaintiff**

8.      Plaintiff is an African American woman.

9.      Plaintiff has: a Master Degree in Chemical Life Education, issued by the University of Maryland in 2017; a Master of Science Degree, with concentrations on biochemistry and molecular biology, issued by Oregon Health Science University in 2013; and a Bachelor of arts Degree issued by the University of California, Berkeley, in 1994.  She is currently pursuing her PhD in Bioenvironmental science at Morgan State University.

10.     Plaintiff has worked as a teacher an adjunct professor at various schools and organizations; Warner Pacific University, Portland, Oregon (2017-present); Wilbraham and Monson Academy (2018-19); Portland Community College (2015-18); and the Casey Eye

2

Institute, Portland, Oregon (2009-13).

11.     Plaintiff has extensive training in issues involving diversity, including diversity at the workplace.  She was a Science Curriculum Accreditation Diversity Specialist at the Urban League in Portland, Oregon from August 2014 through September 2016, and a Faculty Internship Diversity Intern at Portland Community College from August 2014 through March 2015.

12.     Plaintiff is multi-lingual, and speaks French, Italian, German and Greek (as well as English).

13.     Plaintiff was involved in an automobile accident in 2009.  Unfortunately, the accident left her with serious injuries.  Moreover, the accident left her disabled in that she cannot sit at a desk for a prolonged period.  Plaintiff requires a special desk for people with similar physical ailments.

14.     Plaintiff has several hobbies for which she has received training.  One of these hobbies is classical singing.

**B.  Background**

15.     Plaintiff was hired by Sag Harbor in January 2020 to the position of part-time Parish Administrator.

16.     Sag Harbor is an employer as defined by New York Executive Law.

17.     At all times heretofore and hereinafter alleged, Sag Harbor was Plaintiff's employer within the meaning of New York Executive Law.

18.     As a result of plaintiff's employment with Sag Harbor, plaintiff received remuneration that was jointly paid by the Diocese and Sag Harbor.

19.     As Plaintiff has received remuneration from Sag Harbor, Sag Harbor is an employer within the definition of "employer" as contained in Title VII.

20.     Plaintiff was hired by the Diocese in January 2020 to the position of part-time

Parish Administrator.  Plaintiff was employed in that capacity until May 24, 2022.

21.     The Diocese is an employer as defined by New York Executive Law.

22.     At all times heretofore and hereinafter alleged, the Diocese was Plaintiff's employer within the meaning of Title VII and New York Executive Law.

23.     As Plaintiff has received remuneration from the Diocese, the Diocese is an employer within the definition of "employer" as contained in Title VII.

24.     At all times heretofore and hereinafter alleged, the Diocese and Sag Harbor were Plaintiff's joint employers.

25.     During the course of Plaintiff's employment with Sag Harbor, both Sag Harbor and the Diocese, separate and apart from each other, directed Plaintiff to perform position responsibilities.

26.     In addition to directing Plaintiff to perform position responsibilities, Sag Harbor and the Diocese jointly directed Plaintiff in the terms and conditions of her employment.

27.     Examples of the joint direction Plaintiff received from the Diocese and Sag Harbor include, but are not limited to: setting Plaintiff's compensation; setting Plaintiff's weekly hours of employment; setting Plaintiff's daily hours of employment; setting the schedule for Plaintiff's work hours and days; setting a schedule for Plaintiff's job duties, and; assigning Plaintiff job duties.

28.     Plaintiff often worked directly with, and was often supervised directly by, the Diocese.  Plaintiffs job duties included working directly with Diocese with respect to many aspects of Defendants' business, including, *inter alia*, the issuance of grants; the hiring, supervision, and payment of third parties and vendors; responses to requests; addressing complaints; and addressing concerns of racial discrimination.

29.     During Plaintiff's employment with the Diocese, Sag Harbor, and the individual

Defendants (collectively, "Defendants") her performance was always exemplary. Indeed, Plaintiff received only positive feedback regarding her job performance until she complained about Defendants' discriminatory behavior in February 2021.

30.     Plaintiff filed a charge with the United States Equal Employment Opportunity Commission (the "EEOC") in or about June 2021, complaining of the acts of discrimination and retaliation alleged herein. On or about January 4, 2022, the EEOC issued plaintiff a notice informing her of her right to Defendants. Defendants subsequently agreed to toll the applicable statutes of limitations to allow the parties to negotiate and try to arrive at a settlement.

31.     Although no settlement has been achieved, the statutes of limitations tolls to which Defendants agreed have not expired. Plaintiff has thus complied fully with all prerequisites required by Title VII.

### C. Discrimination

32.     Plaintiff's first direct interaction with Defendants occurred in January 2020, prior to her employment with Defendants. At that time, Plaintiff reached out to Sag Harbor to inquire about using Sag Harbor's facilities to practice her classical singing.

33.     In January 2020, Plaintiff met with defendant Campbell, who was the Church's Reverend. Campbell told Plaintiff that Plaintiff might be able to use the Church's facilities for practice, but that a fee was required.

34.     Plaintiff later learned that Campbell regularly allowed musicians to use their facilities to practice without paying anything, so long as the musicians were White. African Americans, such as Plaintiff, were required to pay a fee.

35.     During their initial meeting, Campbell talked to Plaintiff about the history of the Church, the Church's operations, etc. Campbell mentioned that she felt she had had difficulties with the Church's Black parishioners, who, Campbell said, left the congregation soon after she

arrived.  Plaintiff told Campbell that she had experience with diversity issues, and that perhaps she could help the Church.

36.     During their initial meeting, Campbell also mentioned that the Church's then-current Parish Administrator was leaving.  They discussed the Parish Administrator's job duties, and Plaintiff opined that it sounded like a job she could do.

37.     Within a few days after their initial discussions, Campbell contacted Plaintiff and offered her a job as part-time Parish Administrator.  They also discussed Plaintiffs' request to use the Church's practice facilities to practice her music.  Campbell reiterated that the Church charges a fee for use of their facilities, but suggested that Plaintiff could possibly sing at Church services in lieu of paying money for the practice space.

38.     Plaintiff began working for Defendants as Parish Administrator in January 2020.  Plaintiff was never given an application to complete, and was never given the forms that are generally required for employment.  One typical form that Plaintiff did not receive involves employees' disability status, which is particularly relevant to Plaintiff because she has been disabled since her car accident, and cannot sit for long periods of time.

39.     Plaintiff told Campbell about her disability status within the first few months of her employment, and that she needed to order a special desk designed to make deskwork more tolerable for individuals with Plaintiff's disability.   The desk cost about $62.00.  Campbell gave Plaintiff permission to buy the desk with the Church's funds.

40.     Plaintiff's job duties as Parish Administrator were poorly defined, but generally included:

   a.   running the Church's front office;

   b.   purchasing needed supplies with a Church credit/debit card;

   c.   lead human resources administrator;

    d.  responsibility for financial tasks;

    e.  banking deposits;

    f.  managing financial reports;

    g.  creating commercials for Church;

    h.  advertising;

    i.  working with radio stations and newspapers;

    j.  paying monthly bills;

    k.  responsibility for Sag Harbor's Facebook page and youtube.com posts;

    l.  scheduling Church and community functions at the Parish Hall; and

    m.  addressing Parishioners telephone inquiries and preparing of bulletins (prayer booklets for any occasion);

    n.  running various errands;

    o.  keeping track of Parishioner pledges;

    p.  driving throughout Long Island for church supplies; and

    q.  managing the church pews and cleaning the church bathrooms.

41.    Plaintiff's predecessor as Parish Administrator was an African American woman named Tasha Spruhill.  When Campbell discussed Ms. Spruhill, she spoke in a very derogatory manner, and characterized Ms. Spruhill as a lazy employee who did nothing right.  However, when Plaintiff communicated with Ms. Spruhill to help her get up-to-speed with her new job, she consistently found Ms. Spruhill to be helpful, hardworking, and knowledgeable.

42.    Moreover, when Plaintiff reviewed the work Ms. Spruhill had done prior to leaving, Plaintiff found that it was good and largely free of errors.  As time went on, and Plaintiff noticed that Campbell and Claudia Ward always made excuses for mistakes made by Whites but were extremely critical when discussing work done by Ms. Spruhill (and Plaintiff after Plaintiff made

her initial complaint of discrimination).  Ward was a Church administrator, and was partly responsible for accounting issues, paying the Church's bills, and keeping track of pledges.

43.    Defendants utilized a double standard: work by White people was generally OK, regardless of results, while work by African Americans was suspect and usually deemed unacceptable.

44.    Over the course of her first year of employment, Plaintiff noticed that racism was prevalent at the Church, members of its vestry, Campbell, and Ward.  For example, Campbell and Ward consistently referred to Plaintiff as "colored."  Plaintiff repeatedly told Campbell that the use of the word "colored" in that manner was considered a racial slur, and that she simply should not use the word when discussing other people.  Furthermore, when Plaintiff found that the Church's old records often referred to African American parishioners as "colored," she told Campbell that the records' use of this term was extremely hurtful and inappropriate.

45.    Campbell and Ward continued to use the term "colored" within earshot of Plaintiff throughout her time at the Church, despite Plaintiff's frequent objections.  Indeed, Campbell seemed to enjoy saying "colored" in Plaintiff's presence, especially after Plaintiff complained about racial discrimination in February 2021.

46.    As Plaintiff continued working for as Parish Administrator, Campbell's bigotry became clearer.  When discussing Campbell's attorney and/or the local Rabbi, Campbell referred to either as "the Jew."  She also mentioned that a mutual acquaintance of Campbell and Plaintiffs' "had to be gay" because Campbell's "gaydar went off" whenever she saw him at alcoholics anonymous meetings held at the Church.  This comment shocked Plaintiff because it was not only homophobic and inappropriate, but also violated the individual's anonymity.

47.    Campbell had a habit of mentioning African Americans' race in unnecessary, often inappropriate ways.  When local children used the Church's property for playing, Campbell

commented to Plaintiff about any children who happened to be black.  On at least one occasion, she told Plaintiff that she noticed that one of the children playing on Church grounds was black, and that she spent time watching him, studied what he was doing, how he interacted with other children, etc.  Plaintiff found these comments to be bizarre and unsettling, and they contributed to an increasingly hostile work environment.

48.     Throughout Plaintiff's employment with Defendants, she was subjected to racism and treated like a second class citizen.  Although Plaintiff was supposed to work a limited number of hours, and was supposed only handle administrative matters, she was treated like a manual, unskilled worker who was expected to be at Defendants' beck and call for virtually anything that needed to be done.

49.     Campbell regularly called Plaintiff during non-working hours, often at odd times, to ask Plaintiff to assist with manual chores that had nothing to do with her job.

50.     Furthermore, Campbell treated Plaintiff like a personal chauffer, and demanded that she drive her around the Hamptons.  Campbell was particularly insistent when she was planning to see African Americans whom she hoped would join the congregation. This was not part of Plaintiff's job description, and is something that would not have been asked of White employees. Campbell was using her as a prop or a token.

51.     Plaintiff's opinions and recommendations were ignored.  When she was hired, she was led to believe that as an administrator, she would have a say in the handling of the Church's management.  Unfortunately, virtually nothing she suggested or said at work was taken seriously. Despite Plaintiff's title, she was expected to behave as a servant.  Her treatment stood in stark contrast to that of Claudia Ward who, despite having less experience, less education, and a job title that was not superior to that of Plaintiff, was treated with respect and had her opinions taken seriously.

52.     The computer Defendants provided Plaintiff for work was defective.  Plaintiff regularly asked Campbell if they could buy a new computer or at least have their current one repaired, but her requests were ignored.  Plaintiff had no choice but to use her own computer for work, which was eventually compromised because it lacked the capacity to handle the amount of data required for Church operations.

53.     Eventually, after several months, Ward told Campbell that she thought it was time for a new computer; Campbell agreed to Ward's request without hesitance or questions.

54.     Over the course of Plaintiff's first six months of work, Defendants refused to provide any training to Plaintiff, and Plaintiff had to learn by trial and error.  She often requested training, but her requests were denied.  However, during the summer of 2000, Plaintiff learned that training *was* provided to Ward, despite the fact that Ward already had experience with the subject matter.

55.     Plaintiff asked why Ward was given training despite that fact that she seemed to need it less than Plaintiff.  Plaintiff was never provided an answer, and considers that she was denied training because of her race.

56.     Coincidently, Plaintiff converted to Islam during the time she was working for Defendants.  When she informed Campbell about her faith, Campbell did not try to hide her disapproval.  Indeed, on a Sunday following Plaintiff's conversion, Campbell made several anti-Islamic remarks during her sermon, including statements to that effect that Muslim women were expected to be subservient.  Plaintiff found Campbell's remarks to be deeply offensive, and considered that Campbell deliberately said them to upset her.

57.     In May 2020, Plaintiff, along with Campbell and parishioners, participated in a "coffee hour" discussion over Zoom when a parishioner mentioned that his daughter was subject to racial discrimination at school.  The man who was speaking is White and is married an East Indian

woman.  During the call, he said he was upset because his daughter had regularly been subject to the word "nigger" at school.  Plaintiff was shocked, and told the other participants on the call that that was the most offensive, insulting, and humiliating word an African American can hear, and that it is a word that should never be spoken.  She further mentioned that African Americans find it very painful to hear this word when spoken by White people.

58.     The man apologized to Plaintiff for any distress his words might have caused her. Plaintiff suggested that he contact the U.S. Office of Civil Rights, as well as the principal of the school (which happens to be Plaintiff's alma mater).

59.     Over the next few weeks, Campbell regularly mentioned the Zoom call discussion in front of Plaintiff and others, and seemed to delight in saying the word "nigger" in Plaintiff's presence, despite the fact that Plaintiff told her that she literally finds it upsetting to hear.  Plaintiff repeatedly asked her to stop saying it, but Campbell ignored her requests.

60.     About one (1) week after the Zoom meeting, Campbell began discussing the Zoom meeting with plaintiff in the parish hall.  During this conversation,  Campbell paused, looked at Plaintiff, and said "nigger."  Plaintiff, feeling shocked and violated, once again explained to Campbell that that was an incredibly offensive word, and one that Campbell should go to great lengths to avoid, particularly when speaking with an African American.  She suggested, as she had many times before, that Campbell say "n-word" instead of speaking the slur aloud.

61.     Approximately fifteen (15) minutes later, Campbell engaged in a telephone conversation with someone while still within close and obvious earshot of Plaintiff.  Campbell once again began talking about the Zoom conference, and once again loudly said the n-word. Campbell deliberately repeated this horrible racial slur because she wanted Plaintiff to hear it.

62.     Defendants' racially discriminatory treatment of Plaintiff continued throughout the summer of 2020 and into 2021.

63.     Beginning around July 2020, Plaintiff often found Ward sitting next to Campbell in Plaintiff's chair when Plaintiff arrived at work to begin her office hours.  Because there was very little room in the office, Plaintiff was forced to wait outside while Campbell and Ward talked. Plaintiff found herself waiting outside her office for long periods of time – sometimes more than an hour – while Campbell and Ward engaged in conversation.  It should be noted this happened when Plaintiff, and not Ward, was scheduled to be working.

64.     Campbell and Ward knew that Plaintiff was outside waiting; they seemed to find it amusing to humiliate her.

65.     Campbell and Ward's conversations – held while Plaintiff was waiting outside the office for them to allow her to do her job – were often blatantly racist.  On at least one occasion she heard Ms. Ward say "the colored girl?" with an inflection that clearly indicated that they were talking about her.

66.     On one occasion, after Plaintiff had spent a considerable amount of time outside the office waiting to be allowed to begin working, Campbell came out of the office, sat next to Plaintiff, and began telling her about how when Campbell was child growing up California her parents sympathetic to the Ku Klux Klan (the "KKK").  She further stated that the KKK have an established procedure for destroying African American lives, involving isolating them and displacing them both geographically and economically.  Campbell was wearing a smirk while saying this.  Plaintiff found the conversation to be chilling and threatening.

67.     Eventually Plaintiff had no choice to be request that Campbell text Plaintiff and let her know when Ward had left the office before she came to work.  Plaintiff did not have the time to spend long periods waiting while Campbell and Plaintiff chatted, and she could not afford to waste gasoline driving back and forth.

68.     Defendants continued to treat Plaintiff with a fundamental lack of respect.  In

August 2020, Campbell confronted Plaintiff about Plaintiff's political opinions. Campbell began scolding Plaintiff regarding her perceived support of Donald Trump, saying "I cannot see how you support Donald Trump as an African American." Plaintiff explained that she believed Trump had done a lot to support historically Black colleges and universities.

69.     Campbell refused to accept Plaintiff's opinion, and continued to scold Plaintiff about how she was wrong and could not vote for Trump. Campbell was implying that Plaintiff was too stupid to think for herself. Plaintiff found Campbell's lecturing to be incredibly condescending and bigoted.

70.     By September 2020, Plaintiff had learned enough about Sag Harbor's operations to know that Campbell lied to her when she told her that musicians were charged a fee for use of the Church's practice facilities. Plaintiff learned that other musicians had been allowed to practice at Sag Harbor's facilities without paying anything. The only difference between the musicians who were not charged a fee and herself is that the former were White.

71.     Moreover, she learned that Defendants regularly paid White musicians to perform at Church services, and did not charge these musicians anything for their practice time. Plaintiff, in stark contrast, was not paid anything to sing at Sag Harbor. Indeed, she was told that she had to sing for free to compensate for her use of the Church's facilities. In other words, White people were paid to perform and not charged for practice facilities, while Plaintiff – an African American woman – was charged for practice time, and forced to sing without pay as a means of satisfying these charges. This was a blatantly racist double standard.

72.     In September 2020, Plaintiff told Campbell what she had learned about the inequalities regarding the way Sag Harbor handled musicians, and that she was unwilling to pay to practice or sing for free going forward. Campbell agreed that Plaintiff would no longer be charged for practice time, and that she could add the time she spent singing for Sag Harbor to her weekly

pay.

73.     Later in September, Campbell approached Plaintiff and told her that Ward had mentioned to her that Plaintiff had purchased a special desk without permission.  Plaintiff protested that this simply was not true, and reminded her that, in reality, she had repeatedly discussed her disability with Campbell, and had received permission to buy it.

74.     Moreover, over the prior year, a former parishioner had sued Sag Harbor for disability discrimination.  Plaintiff discussed this lawsuit with Campbell and, in so doing, discussed her own disability and her need for the special desk.  Campbell never indicated that there was anything improper about purchasing the desk, or that she had any questions about its necessity.

75.     Despite Campbell's prior consent and Plaintiff's disability, Defendants required Plaintiff to repay the $62.00 spent on the disability desk.

76.     Plaintiff hoped that things would improve, and that Defendants would stop discriminating against her, begin respecting her opinion, stop using racial slurs, etc. Unfortunately, nothing changed, and in February 2021, she met with Campbell and Ward and told them that she felt she was being regularly discriminated against because of her race.

77.     Plaintiff complained that her professional opinions were ignored, and outlined the discrimination she regularly suffered at Sag Harbor, as described above.  She pointed out that she had extensive training and education, including accounting training, and knew what she was talking about when she made suggestions.  Nevertheless, Defendants ignored her suggestions and treated her less like an administrator than like an unskilled, ignorant laborer.

78.     Defendants took no action whatsoever in response to Plaintiff's Complaint of discrimination.  No investigation was ever conducted.  Indeed, the racism Plaintiff experienced only worsened as Defendants began a campaign of retaliation against her.

79.     Campbell and Ward began to regularly blame Plaintiff for mistakes that she had nothing to do with, and that were often obviously caused by Campbell or Ward themselves.

80.     In February 2021 Sag Harbor began bouncing checks; Plaintiff knows this because she heard Campbell discussing it, and because they began receiving telephone calls from vendors complaining that they had not been paid.  This was caused by mistakes made by Ward.  Despite this, Defendants first reaction whenever a check bounced was to try to blame it on Plaintiff by falsely accusing her of improperly recording her hours.  These accusations were never true – there were no incidents where checks bounced or other financial problems occurred because of Plaintiff's acts or omissions.

81.     Several of the bounced checks (and resulting false accusations against Plaintiff) occurred after Ward deposited a Paycheck Protection Program ("PPP") check into the wrong account.  After repeatedly falsely accusing Plaintiff of causing problems by recording too many working hours, Campbell announced that they had determined that the problems were caused by Ward's mishandling of the PPP money.  Defendants did not apologize to Plaintiff for their false accusations.

82.     Another similar event occurred in the spring of 2022 when checks bounced as a result of Ward spending considerable sums of money on window training without properly recording them.  Defendants falsely accused Plaintiff of somehow causing financial problems, but did not apologize when the truth became clear.

83.     At or around the week of April 13, 2021, Plaintiff was told that she would be required to attend meetings with Campbell and vestry member Kim Bambino.  Plaintiff repeatedly asked Campbell what the meetings would be about, but Campbell refused to tell her.  On April 20, 2022 (the day before the meetings), Plaintiff was informed that the meeting would address her job duties.

84.     The meetings were held on or about April 21, 2021.  During the meetings, they discussed Plaintiff's job duties, but it quickly became apparent that the main reason Campbell and Bambino called the meetings was to discuss posts Plaintiff had uploaded onto Facebook.

85.     As noted above, during Plaintiff's initial meetings with Campbell, they discussed Campbell's concerns about Sag Harbor's inability to attract and keep African American parishioners, and how Plaintiff's diversity training experience could help them.  After Plaintiff was hired as Parish Administrator, she was put in charge of the Church's Facebook page.  In an effort to foster diversity, many of the posts Plaintiff uploaded addressed African American experiences, as well as the experiences of Native Americans, Latinos, and civil rights in general.  Plaintiff discussed these posts with Campbell, and received very positive feedback about them from Sag Harbor's parishioners and from its Bishop.

86.     At one of the April 2022 meetings, however, Plaintiff was attacked by Bambino about the content of these posts while Campbell watched.  Bambino stated that Plaintiff's Facebook posts were "not attracting the right kind of people."  Plaintiff repeatedly asked Bambino what she meant, why she thought the posts were attracting the "wrong" people, what kind of people were the "right" people, what she would prefer to see on Facebook instead, etc.  Bambino steadfastly refused to answer her questions, however, and told Plaintiff that Bambino did not "have to answer that."

87.     Bambino's attack was obviously racist – the only possible explanation for what she considered to be the "right" people is that she meant "White" people.  Plaintiff was devastated, and removed all of the Facebook posts containing anything other than Campbell's sermons.

88.     Defendants' campaign of retaliation against Plaintiff only intensified after the events of April 21, 2022.  Shortly thereafter, Campbell announced that due to allege financial constraints, the hours of both Plaintiff and Ward would be reduced.

89.     Thereafter, plaintiffs *hours* were reduced, but the amount of work she was given did not change.  Defendants instructed Plaintiff to complete her work going forward in fifteen (15) hours or less.  However, Defendants did not reduce the amount of work Plaintiff told to complete. Essentially, they were now instructing Plaintiff to complete twenty five (25) to thirty (30) hours per week in fifteen (15) hours – an impossible task.

90.     Moreover, despite Campbell's announcement that Plaintiff and Wards' hours would be reduced, Wards hours actually increased.  No explanation was given for this discrepancy.

91.     In early May 2021, while Plaintiff was entering the Parish Hall to review, post and edit the Sunday church service on the Sag Harbor's Facebook page, vestry member Achenbach confronted Plaintiff and asked her "what are you stealing now."  Plaintiff, shocked by the blatantly racist implication that she must have been stealing something, looked at Achenbach and asked "what?"  Instead of answering the question or explaining herself, Achenbach began scolding Plaintiff that Campbell's sermon was too hard on the police, who are fine people.

92.     Plaintiff responded by noting that she had nothing to do with Campbell's sermon, and that her own brother was a former state trooper and federal officer.  Achenbach then instructed Plaintiff to watch a television show about immigrants having to escape Russia by boat.  The entire conversation, from Achenbach's lecture about a "woke" sermon that Plaintiff had nothing to do with, to her assumption that Plaintiff must somehow be anti-American, was purely based on offensive, racist stereotypes.

93.     On May 21, 2022, Plaintiff while plaintiff was visiting Sag Harbor during non-working hours, she overheard Campbell and Achenbach talking about herself and another individual named Mitchell, who was a former vestry member.  Campbell and Achenbach – who did not realize that Plaintiff was in the room with them and could hear everything they said – talked about how they had driven Mitchell out of the vestry after he sued Sag Harbor for disability

discrimination.  She heard Campbell laughing and telling Achenbach that they were "going to get the colored girl next."

94.     After hearing this, Plaintiff got up to leave the room.  Campbell did a "double take" as she realized, to her shock, that Plaintiff had been in the room with them and had heard what they said.  Campbell then sneered at Plaintiff that she needed to "sign in" to their sign-in sheet, which had recently been implemented as a security measure.

95.     On Sunday, May 22, 2022, Campbell again used the term "colored" when talking about African Americans during her sermon.  Plaintiff was there at the time, and Campbell deliberately said it to mock her.

96.     On May 24, 2022, Campbell informed Plaintiff that she was fired and had to remove her belongings form the Church.  As Plaintiff was packing up her things, she heard Campbell and Achenbach talking about her.  Specifically, she heard Campbell refer to her as "Little Kentucky," and Achenbach refer to her as "the Nigra."

97.     Before leaving, Plaintiff told Campbell that she had been horribly racist, and that she had continued to use the words "colored" and "nigger" in her presence even though she repeatedly asked her to stop.  Campbell brazenly and defiantly admitted that she had used those terms.

98.     Plaintiff further accused Campbell of setting Plaintiff up to fail after the April 24 meeting; Campbell admitted that this was true.

### FIRST CAUSE OF ACTION
### Title VII Race, National
### Origin, and Religion
### Discrimination Against Sag Harbor and Diocese

99.     Plaintiff repeats and realleges paragraphs 1 through 98 of this Complaint as if fully set forth herein.

100.    Sag Harbor and Diocese have discriminated against Plaintiff in the terms and conditions of her employment based on her race, national origin, and religion in violation of Title VII.

101.    Defendant Sag Harbor is liable under Title VII as Plaintiff's employer.

102.    Defendant Diocese is liable under the Title VII as Plaintiff's employer.

103.    Sag Harbor and Diocese have acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

104.    As a result of Sag Harbor and Dioceses' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

### SECOND CAUSE OF ACTION

### 42 U.S.C. § 1981 Race
### Discrimination Against All Defendants

105.    Plaintiff repeats and realleges paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.    By the acts and practices described above, Defendants have discriminated against Plaintiff on the basis of race in violation of Section 1981.

107.    Defendants have acted intentionally and with malice or reckless indifference to Plaintiff's statutorily protected rights.

108.    As a result of Defendants' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION

### NYSHRL National Origin, Race, and Religion
### Discrimination Against All Defendants

109.     Plaintiff repeats and realleges paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.     By the acts and practices described above, all Defendants have discriminated against Plaintiff on the basis of her race, national origin, and religion in violation of the NYSHRL.

111.     Defendant Sag Harbor is liable under the NYSHRL as Plaintiff's employer.

112.     Defendant Diocese is liable under the NYSHRL as Plaintiff's employer.

113.     Defendant Campbell is liable under the NYSHRL as Plaintiff's employer and/or as an aider and abettor of the discrimination against Plaintiff.

114.     Defendant Ward is liable under the NYSHRL as an aider and abettor of the discrimination against Plaintiff.

115.     As a result of Defendants' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

116.     Defendants have acted intentionally and with malice or reckless indifference to Plaintiff's statutorily protected rights.

## FOURTH CAUSE OF ACTION
### Title VII Retaliation
### Against Sag Harbor and Diocese

117.     Plaintiff repeats and realleges paragraphs 1 through 116 of this Complaint as if fully set forth herein.

118.     Sag Harbor and Diocese retaliated against Plaintiff for her protected complaints and opposition to unlawful employment practices in violation of Title VII.

119.     Defendant Sag Harbor is liable under Title VII as Plaintiff's employer.

120. Defendant Diocese is liable under the Title VII as Plaintiff's employer.

121. Sag Harbor and Diocese acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

122. As a result of Sag Harbor and Dioceses' retaliatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION

### 42 U.S.C. § 1981
### Retaliation Against All Defendants

123. Plaintiff repeats and realleges paragraphs 1 through 122 of this Complaint as if fully set forth herein.

124. By the acts and practices described above, Defendants have retaliated against Plaintiff in violation of Section 1981 for her protected activity.

125. Defendants have acted intentionally and with malice or reckless indifference to Plaintiff's statutorily protected rights.

126. As a result of Defendants' retaliatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

## SIXTH CAUSE OF ACTION

### NYSHRL Retaliation Against All Defendants

127. Plaintiff repeats and realleges paragraphs 1 through 126 of this Complaint as if fully set forth herein.

128. By acts and practices described above, Defendants have retaliated against Plaintiff for her protected activity and for opposing practices prohibited by NYSHRL.

129.    Defendant Sag Harbor is liable under the NYSHRL as Plaintiff's employer.

130.    Defendant Diocese is liable under the NYSHRL as Plaintiff's employer and/or as an aider and abettor of the retaliation against Plaintiff.

131.    Defendant Campbell is liable under the NYSHRL as Plaintiff's employer and/or as an aider and abettor of the retaliation against Plaintiff.

132.    Defendant Ward is liable under the NYSHRL as an aider and abettor of the retaliation against Plaintiff.

133.    As a result of Defendants' retaliatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

134.    Defendants have acted intentionally and with malice or reckless indifference to Plaintiff's statutorily protected rights.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a.    Declaring that the acts and practices complained of herein violate Title VII, Section 1981, and NYSHRL;

b.    Directing Defendants to pay Plaintiff compensatory damages, including damages for loss of earning potential, emotional distress, humiliation, and pain and suffering;

c.    Directing Defendants to pay Plaintiff punitive damages as provided by Title VII, Section 1981, and NYSHRL;

d.    Awarding Plaintiff reasonable attorneys' fees and costs;

e.    Awarding Plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

f.   Granting Plaintiff a tax enhancement award to offset adverse tax consequences associated with a lump sum award of damages; and

g.   Granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

LAW OFFICE OF BRIAN L. GREBEN

/s/ Brian L. Greben
_____
Brian L. Greben
*Attorney for Plaintiff*
CAROL A. SMITH
316 Great Neck Road
Great Neck, NY 11021
(516) 304-5357